EARL BECKER *v.* CROWN CENTRAL PETROLEUM CORPORATION

[No. 924, September Term, 1974.]

*Decided June 4, 1975.*

The cause was argued before ORTH, C. J., and THOMPSON and MOYLAN, JJ.

*John W. Pfeifer,* with whom was *James J. Fabian* on the brief, for appellant.

*Charles E. Partridge, Jr.,* with whom were *Morton A. Sacks* and *Cable, McDaniel, Bowie & Bond* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

The General Assembly of Maryland at its session held in 1973 made known its concern about the distribution and sale through marketing arrangements of petroleum products in this State. It declared that the economy, the public interest, welfare and transportation were vitally affected thereby and found it necessary to define the relationships and responsibilities of the parties to certain agreements pertaining thereto. Code, Art. 23, § 167A. It did so by enacting the "Maryland Gasoline Products Marketing Act" as a subheading under the "Corporations" Article.[1] Ch. 662, Acts 1973, codified as Art. 23, §§ 167A to 167-I. Section 3 of ch. 662 made the Act apply "to dealer agreements and all renewals and extensions thereof entered into on or after July 1, 1973."

As enacted in 1973 the Act defined certain terms, § 167C;[2] required certain information to be given by a distributor to a prospective dealer, § 167D; set out provisions to which marketing agreements are subject, § 167E; imposed liability

---

1. Art. 23, § 167B provided: "This subheading may be cited as the 'Maryland Gasoline Products Marketing Act'."

2. Section 167C of the Act provided:

"(1) 'Distributor' means any person engaged in the sale, consignment, or distribution of gasoline products through retail outlets which it owns or leases, and who maintains a written contractual relationship with a dealer for the sale of the products, and shall include any subsidiary or affiliated corporation in which it holds at least thirty percent voting control;

(2) 'Dealer' means any person engaged in the retail sale of gasoline products under a marketing agreement entered into with a distributor, other than a person who is an employee of a distributor;

(3) 'Marketing agreement' means a written agreement between a distributor and a dealer under which the dealer is granted the right to use a trademark, trade name, service mark, or other identifying symbol or name owned by the distributor, and a written agreement between a distributor and a dealer by which the dealer is granted the right to occupy premises owned, leased or controlled by the distributor, for the purpose of engaging in the retail sale of gasoline products supplied by the distributor;

(4) 'Engaged in the retail sale of gasoline products' means that at least thirty per centum of the dealer's gross revenue is derived from the retail sale of gasoline products;

(5) 'Retail' means the sale of a product for purposes other than resale."

on a distributor for wrongful termination of the agreement, § 167F; specified defenses to actions based on termination of the agreement, § 167G; provided for notice of intent to terminate or cancel an agreement, § 167H; and designated remedies for violations of the Act, § 167-I. It is manifest that the Legislature adopted a comprehensive scheme covering three general areas: (1) it required certain information to be given by a distributor to a prospective dealer; (2) it delineated certain provisions to which marketing agreements [were] subject; and (3) it provided sanctions for violations.

The first area enabled a prospective dealer to make an intelligent and considered decision on whether to enter into an agreement. It included such data as the gallon volume history; the names and addresses of previous dealers at the location for the past five years and the reasons their marketing agreements were terminated; any legally binding disposition of the location; the training programs the distributor will furnish and the specific goods and services it will provide. Full disclosure was required of (a) all obligations required of the dealer, (b) all restrictions on sale, transfer and termination of the agreement, and (c) the total amount of any cash deposits required, interest charges to be paid thereon and conditions for the return of the deposit. Art. 23, § 167D (1) - (7).

Section 167E delineated the "[p]rovisions to which marketing agreements [were] subject." The section began:

> "Every marketing agreement between a distributor and a dealer shall be subject to the following provisions whether or not expressly set forth therein:"

The provisions were set out in eight paragraphs. One gave a dealer a grace period within which he may cancel an executed agreement, ¶ (2). Three specified what a dealer shall not be required to do: to keep open for any specified number of hours a day or days a week unless expressly set forth in the agreement, ¶ (1); to sell products at a price fixed by the distributor, ¶ (4); to use any promotion in the

operation of the business, ¶ (5). Paragraph (3) prohibited an agreement waiving the right of either the dealer or distributor to trial by jury or to interpose counterclaims or cross-claims. Paragraph (6) established certain rights and obligations in the event of any termination or cancellation of an agreement by mutual agreement or otherwise. Paragraph (7) forbade a distributor from withholding unreasonably its consent to any assignment, transfer, or sale of a marketing agreement. Paragraph (8) read:

> "With respect to nonrenewal of a marketing agreement, either party must give the other party notice of his intent not to renew a marketing agreement at least 90 days prior to the expiration of the term of that marketing agreement."

The third area dealt with sanctions. They included civil liability for damages for violation of any provision of the Act and other remedies legal or equitable as may be available to the party injured by a violation, § 167-I. A distributor who has a written marketing agreement with a dealer shall be liable to the dealer as provided in § 167-I for the distributor's wrongful or illegal termination or cancellation of the marketing agreement during its terms, § 167F. Defenses to an action predicated upon the termination or cancellation of an agreement are designated in § 167G, but they are available only when notice of intent to terminate or cancel is given as provided in § 167H, namely, written notice to the other party in person or by certified mail at least 60 days prior to the date which it intends to terminate or cancel the , marketing agreement, "provided, however, that where criminal misconduct, fraud, abandonment, bankruptcy or insolvency of the dealer, adulteration of product, or the giving of a dishonored nonsufficient fund check, is proven at the time of termination or cancellation, the 60-day notice shall not be required."

On 3 July 1973 Crown Central Petroleum Corporation and Earl Becker entered into a "Lease and Dealer Agreement." It is clear that within the contemplation of the Act, Crown was a distributor, Becker was a dealer and the agreement was a

marketing agreement. Under date of 29 March 1974 Crown sent Becker a "Notice of Cancellation" which was received by him on 3 April 1974 by certified mail. The Notice read:

> "You are hereby notified that pursuant to provisions thereof we are hereby cancelling the following agreements which have heretofore been entered into by you with us:
>
> BRANDED SERVICE STATION LEASE AND DEALER AGREEMENT DATED JULY 3, 1973.
> *THIS NOTICE SHALL BE EFFECTIVE JUNE 30, 1974.*
>
> We reserve all claims against you by reason of any breach by you of the above agreements or any of them or by reason of any indemnity agreement contained therein."

On 5 June 1974 Becker instituted an action in the Circuit Court for Baltimore County against Crown for a declaratory judgment and interlocutory injunctive relief. On 1 July the parties filed a stipulation. They agreed in paragraph 1 thereof:

> "1. Plaintiff, Earl Becker, shall temporarily remain at the service station located at 5217 Baltimore National Pike, Baltimore, Maryland 21229 under the terms of the Branded Service Station Lease and Dealer Agreement dated July 3, 1973 between the Plaintiff and Defendant until August 31, 1974 or until this case has been heard and decided on the merits, whichever shall first occur."

This rendered moot the request for injunctive relief. Paragraphs 4 and 5 of the stipulation read:

> "4. The 90-day notice of non-renewal called for under the provisions of Article 23, Sections 167E (8) of the Maryland Code was not afforded the Plaintiff.

5. Trial on the merits of this litigation will be limited to the following factual and legal issues:

(a) Whether or not the Plaintiff received legally sufficient notice of termination for cause in accordance with Article 23, Sections 167G and 167H,

(b) Whether, in fact, such cause for termination existed,

(c) Assuming no such cause existed under the Maryland Gasoline Products Marketing Act, whether such statute, if construed to in any way regulate or interfere with Defendant's right to cancel or terminate Plaintiff's use of Defendant's federally registered trademark, is unconstitutional under the Supremacy Clause of the United States Constitution, in that the Lanham Act, 15 USC, Sec. 1051 et seq. may have entirely preempted the field of regulation and control of such trademarks."

On 26 August when the case came to trial by the court without a jury, another issue was presented for determination which we designate as issue (d):

"Whether any notice was required to terminate the agreement."

The trial was concluded the same day, and the decision held *sub curia*. A declaration of the court was issued on 8 November and filed on 12 November.[3] The court determined "that the Branded Service Station Lease and Dealer Agreement dated July 3, 1973 between Crown Central Petroleum Corporation, Defendant, and Earl Becker, the Plaintiff, covering a drive-in gasoline service station, located at 5217 Baltimore National Pike, automatically terminated at the end of its term on June 30, 1974 and, therefore, the Defendant in this case is entitled to immediate possession of

---

3. "The declaration may be affirmative or negative in form and effect and has the force and effect of a final judgment or decree." Courts Art. § 3-411.

the premises." On 2 December Becker directed the Clerk of the court to "file an appeal to the Court of Special Appeals in this matter." On 6 December the court issued an order staying its direction that Crown had the immediate right to occupy the service station pending a decision on appeal.[4] It further ordered that during the period of the stay Crown continue to deal with Becker as if the lease between them was in full force and effect. The stay was conditioned upon Becker abiding by the terms and conditions of the lease and posting a supersedeas bond in the amount of $10,000. An approved bond was filed on 17 December. On 17 December Becker noted another appeal "to the Court of Special Appeals in this matter." This latter appeal was filed too late to apply to the judgment of 8 November. Maryland Rule 1012. If it was intended to be with respect to the order of 6 December, see Rule 1017-1021, the propriety of that order, even if subject to appeal, was not briefed. Rules 1031, § c 2, 3, 4 and 1046, § f. Therefore, we do not consider it.

The declaration of 8 November included a memorandum opinion. In the opinion the court observed that there were "certain determinations that must be made before an answer can be given as to the rights of the parties in this case." It designated them:

> "First, the affect of Article 23, Sections 167E, 167G and 167H of the Annotated Code of Maryland. Second, whether or not these provisions of the Annotated Code of Maryland above referred to are unconstitutional as under the combined effect of the Supremacy Clause of the United States Constitution, Article 4 Clause 2, and the Lanham Act 15 U.S.C. Section 1051 *et seq.* Third, whether or not cause existed giving the Defendant the right to cancel the lease agreement from the Plaintiff. Fourth, whether or not there was any necessity for any type of notice to be given by the Defendant to

---

4. This order was apparently upon petition filed by Becker. It indicates that a copy was served on the attorney for Crown on 27 November but it was not filed in the proceeding until 17 December.

the Plaintiff in order to terminate the aforesaid lease agreement."

The court found as a fact that there was no intent on the part of Crown to terminate the agreement for cause, and that, in any event, sufficient cause to terminate for cause did not exist. It determined that "there is no conflict" between the Maryland Gasoline Products Marketing Act and the Lanham Act. It held, however, that a marketing agreement without a renewal clause was not subject to the 90-day notice of intent not to renew required by Art. 23, § 167E (8). It concluded that as there was no renewal provision within the terms of the marketing agreement here, "it was not even necessary that any notice be sent to [Becker] that the lease would cease at the end of the term of the marketing agreement." It was therefore that the court determined that the marketing agreement automatically terminated at the end of its stated term on 30 June 1974 and that Crown was entitled to immediate possession of the premises.

Becker poses only one question on appeal. Basically it is whether the trial court erred in holding that the agreement automatically terminated at the end of its term. The question encompasses whether the agreement was without the scope of the notice requirement of the Maryland Gasoline Products Marketing Act.

Crown accepts this question, but urges that it raises another issue in the event the agreement be found subject to the statutory notice requirement, namely, was the notice here given sufficient under § 167E (8). It then presents two other questions. It asks (a) whether § 167E (8) can be enforced in the light of the Lanham Act and (b) whether the notice here given was sufficient to permit a "for cause" termination of the agreement under § 167G (3) and (4) and § 167H.

*The Maryland Gasoline Products Marketing Act and the Lanham Act*

The "Lanham Act" is codified as Chapter 22, headed "Trade Marks", of Title 15 of the United States Code, §§

1051-1127. The Congress of the United States expressly and clearly set out the intent of the Chapter in § 1127:

"The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations."

The Maryland Gasoline Products Marketing Act, according to its title was fundamentally related to the sale and distribution of gasoline products, providing for the regulation of marketing agreements between gasoline distributors and gasoline dealers, giving dealers a course of action against distributors under certain circumstances and affording distributors certain defenses. The General Assembly found it necessary, as we have pointed out, to define the relationship and responsibilities of distributors and dealers as to agreements between them because the distribution and sale of petroleum products through such agreements were of public interest and vitally affected the welfare, transportation and economy of the State. Although a marketing agreement within the meaning of the Act included one under which the dealer was granted "the right to use a trademark, trade name, service mark, or other identifying symbol or name owned by the distributor", Code, Art. 23, § 167C (3), the legislation focused primarily on the right of a dealer to occupy premises owned, leased or controlled by the distributor, for the purpose of engaging in

the retail sale of gasoline products supplied by the distributor.

In *Florida Lime and Avocado Growers, Inc.*, 373 U. S. 132, 142, the Supreme Court of the United States said:

> "[F]ederal regulation of a field of commerce should not be deemed preemptive of state regulatory powers in the absence of persuasive reasons — either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."

In *Pennsylvania v. Nelson*, 350 U. S. 497, 501-505, the Court stated that three of the most widely accepted tests for supersession were (1) the scheme of federal regulation was so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it; (2) the federal statutes touch a field in which federal interest is so dominant that the federal system must be assumed to preclude enforcement of state laws on the same subject; (3) enforcement of state legislation presents a serious danger of conflict with the administration of the federal program. See *Melville v. State*, 10 Md. App. 118, 122-123.

Applying these tests we do not deem the Lanham Act to be preemptive of Maryland's power to regulate marketing agreements between distributors and dealers of gasoline products. We do not see in the federal statute that Congress has unmistakably ordained that it has preempted such state power. The federal scheme of regulation as to trademarks was not so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it to the extent Maryland did in the Gasoline Products Marketing Act, nor will the enforcement of the Maryland Act present a serious danger of conflict with the administration of the federal program. The mere presence of federal legislation in a particular area does not, in and of itself, create a preemption of all state legislation in that area. States are permitted to act in the interstices of the federal regulatory matrix, even where extensive federal regulatory schemes

have been enacted, if there is no express Congressional language of preemption, and may require more stringent standards than those designed by Congress, and may otherwise adopt laws affecting the subject of a federal statute, so long as the federal purpose is not undermined. *Mariniello v. Shell Oil Company*, 511 F. 2d 853 (3rd Cir. 1975), citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U. S. 470 (1974); *Goldstein v. California*, 412 U. S. 546 (1973); *Rice v. Sante Fe Elevator Corp.*, 331 U. S. 218 (1947).

*The Construction of Code, Art. 23, § 167E (8)*

The agreement consisted of a printed form obviously prepared by Crown. It contained blanks to be filled in to make it applicable to a particular dealer. Paragraph 3 of the form read:

> *"TERM*: This agreement shall be for an initial probationary term of ＿＿＿＿＿ commencing on ＿＿＿＿＿ and an additional probationary term of ＿＿＿＿＿ thereafter, subject to the right of either Crown or Dealer to cancel this Agreement at any time by giving ＿＿＿＿＿ days written notice during the initial probationary term or by giving ＿＿＿＿＿ days written notice during the additional probationary term.
>
> Unless so terminated, this Agreement shall continue for an additional term of ＿＿＿＿＿.
>
> Each of the respective terms of this Agreement are subject to earlier termination under the provisions of Paragraphs 21, 22 and 23."

This paragraph was changed in the agreement executed by Becker and Crown to read as follows:

> *"TERM*: This agreement shall be for a term of One (1) Year commencing on July 1, 1973. Each of the respective terms of this Agreement are subject to earlier termination under the provisions of Paragraphs 21, 22 and 23."

Everything else that appeared in Paragraph 3 of the printed form had been x'ed out and the deletions initialed by the parties. Thus, under the express terms of the agreement, it ran at the longest for one year from 1 July 1973, with no provision for renewal or for continuance for any additional term. It was subject to earlier termination as expressly provided in the specified Paragraphs. Unless earlier terminated by means spelled out by it, it terminated 30 June 1974, and there was no way a party by unilateral action could extend it. Therefore, Becker's question is to be decided by determining what rights and obligations, if any, with respect to renewal were impressed on this agreement by the provisions of the Act as were in effect when the agreement was executed.

The cardinal rule in statutory construction is to effectuate the real and actual intention of the Legislature. *Wilson v. State*, 21 Md. App. 557, 567. This may be determined from the language of the statute, for it is generally true that the Legislature intended to mean what it plainly expresses, *Slagle v. State*, 243 Md. 435. When the exact reach or breadth of a statute lies in doubt, it is construed as a whole, considering all parts together in the light of its legislative history. See *Karns v. Liquid Carbonic Corporation*, 275 Md. 1. That is, statutes are to be construed reasonably with reference to the purpose sought to be accomplished and in accordance with declared legislative policy. *State v. Wagner*, 15 Md. App. 413, 421, and cases therein cited.

Fortunately, we are here afforded access to the legislative history of ch. 662, Acts 1973. Senate Bill No. 820, the "Franchise Practices Act", and No. 821, the "Gasoline Dealers Day in Court Act", were introduced in the Senate on 6 March 1972, read for the first time and referred to the Committee on Judicial Proceedings. They were referred to the Legislative Council of Maryland for study. See Legislative Council Working Agenda for 1972 in which SB 820, designated as Item No. 139, referred to the Council by the Senate Judicial Proceedings Committee, and SB 821, designated as Item No. 215, referred by the House

Committee on Economic Matters were both referred by the Council to the House Committee on Economic Matters.[5] Under date of 25 October 1972 the Chairman of the House Economic Affairs Committee made a report to the Legislative Council:

> "The House Economic Affairs Committee has voted favorably on a Gasoline Dealers Franchise Bill after many extensive hearings and drafts of proposed bills this summer. The Gasoline Dealers bill is a result of the weaknesses the Committee found in Item 139 (S.B. 820 — Franchises) and Item 215 (S.B. 821 — Gasoline Dealers Day in Court Act).
>
> The bill does not address itself to the problem of non-renewal of leases, but does correct many abuses. Full disclosure of all relevant information pertaining to the operation of a service station is required of the franchisor to the franchisee, before a lease is signed. Dealer rights as to hours open for business, the price at which he sells products, participation in company advertising promotions, and re-sale of his company inventory to the company upon termination of the marketing agreement are specified."

The minutes of the Fourth Meeting of the Council held on 25 October 1972 reflect that the report and recommendations were adopted by the Council. See page 373, Report of proposed bills made by the Legislative Council of Maryland to the General Assembly of Maryland of 1973. The bill recommended by the Council was in substance Senate Bill 220, ultimately enacted as the Maryland Gasoline Products Marketing Act, ch. 662, Acts 1973.

It is apparent that SB 820 and SB 821 were strongly opposed by distributors with emphasis on the question of

---

5. The three major Senate Committees and the six major House Committees, of which the Committee on Economic Matters was one, were continued during the interim period of the Legislature as Legislative Council Committees.

renewal of agreements.[6] The bill which received the favorable vote of the House Economic Affairs Committee acting as a committee of the Legislative Council, and which the Council recommended, is set out in pages 141-146 of the Council's Report to the 1973 General Assembly. It is preceded by an explanation which is substantially the same as the Committee report. It states specifically that the bill "does not address itself to the problem of non-renewal of leases", adding "but it does correct many abuses", listing them as contained in the Committee report. Nonrenewal of an agreement is not one of the abuses specified.

In the light of this legislative history and in view of the content of the bill itself, we find it clear that the Legislature intended that the Act not deal with renewal of agreements except in the very limited sense of notice of nonrenewal. The only reference in § 1 of ch. 662, codified as Art. 23, §§ 167A to 167-I, to renewal of a marketing agreement was in § 167E (8), and then in negative terms, requiring in language we have set out *supra*, 90 days notice prior to the expiration of the terms of that marketing agreement by either party of intent not to renew. The only other place in the chapter to which renewals and extensions of such agreements were referred was in § 3 of the chapter, not codified, under which the provisions of the Act applied to agreements "and all renewals and extensions thereof, entered into on or after July 1, 1973."

What the 1973 Act did, therefore, was to read into every marketing agreement executed on or after 1 July 1973 the notice requirement provided by § 167E (8). Either party to the agreement was required to give the other party notice of his intent not to renew at least 90 days prior to the expiration of the term of that agreement. Failure to do so was a violation of the legislative fiat. The remedy for such violation was that spelled out in § 167-I. The person failing to give the required notice was civilly liable for damages caused thereby and was subject to other remedies legal or

---

6. SB 820 made it a violation for a franchisor to terminate, cancel or fail to renew a franchise without good cause. SB 821 imposed liability on a distributor for failure to renew a franchise.

equitable available to the party injured. What the 1973 Act did not do was to require renewal of an agreement. Although there were sanctions for the wrongful termination of an agreement, there were none for a refusal to renew which did not breach the terms of the agreement itself. In short, the Act, as the Legislative Council explained, did not address itself to the problem of nonrenewal.

Our view is supported by what the General Assembly did the following year. It amended the Act, and the amendments, except for one housekeeping matter, ch. 374, Acts 1974, concerned renewal of agreements. The substantive amendments were by way of ch. 852, Acts 1974, effective 1 July 1974. It included oral agreements in the definitions of distributor and marketing agreements, § 167C (1) and (3). In § 167E, dealing with provisions to which marketing agreements were subject, it added to paragraph (6) thereof these provisions:

> ". . . and if the distributor terminates or cancels the agreement, except where there is a material breach by the dealer of the terms of the contractual agreement between the distributor and the dealer or if the distributor unreasonably refuses to renew an agreement without the written assent of the dealer, the distributor shall pay to the dealer, within 30 days after the effective date of the termination or cancellation or unreasonable refusal to renew, the full value of any business goodwill enjoyed by the dealer at the time the dealer is notified of the cancellation or termination or refusal to renew;"

To paragraph (7) which provided that "no distributor shall unreasonably withhold its consent to any assignment, transfer, or sale of a marketing agreement" it added the language "or unreasonably refuse to renew a marketing agreement." As enacted in 1973, § 167F read:

> "A distributor who has a written marketing agreement with a dealer shall be liable to the dealer

as provided in § 167-I for the distributor's wrongful or illegal termination or cancellation of the marketing agreement during its term."

The 1974 amendment added "In addition to any other liability herein provided, including that specified in subsection 167E (7)," [7] at the beginning of the section and added "or the distributor's unreasonable refusal to renew the marketing agreement" at the end of thereof. Section 167J was added: "The Gasoline Products Marketing Act shall constitute a statement of the public policy of this State." The title to ch. 852 included among its purposes "prohibiting the unreasonable refusal by distributors to renew a marketing agreement." Thus the Legislature included in 1974 what it had purposely excluded in 1973,[8] substantiating the belief, if

---

7. *It seems that the reference to § 167E (7) was intended to be to § 167E (6).* Paragraph (7) imposes no liability.

8. The 1974 amendments bring the Act more in line with comparable statutes in a great majority of other jurisdictions. Several states, like Maryland, have passed laws regulating the relationships between manufacturers, franchisors and distributors on one hand and franchisees and dealers on the other. *See, e.g.* Conn. Gen. Stat. Rev. §§ 42-133e to 42-133h (1975); Del. Code. Ann. tit. 6, §§ 2251-2256 (1975); Mass. Gen. Laws Ann. ch. 93B, §§ 1-14 (1972); Minn. Stat. § 168.27 (1974); Neb. Rev. Stat. §§ 53-166.01 to 53-166.17 (1974); Neb. Rev. Stat. §§ 60-1420 to 60-1435 (1974); N. J. Rev. Stat. §§ 56:10-1 to 56:10-12 (Supp. 1975); N. Y. Gen. Bus. Law §§ 195-199 (McKinney Supp. 1974); Ohio Rev. Code Ann. §§ 1333.73 - 1333.74 (Supp. 1973); Okla. Stat. Ann. tit. 47, §§ 561-575 (Supp. 1974); P. R. Laws Ann. tit. 10, §§ 278a - 278d (Supp. 1974); S. C. Code Ann. §§ 46-150.151 to 46-150.163 (Supp. 1974); S. D. Compiled Laws Ann. §§ 37-5-1 to 37-5-9 (Supp. 1974); Tex. Rev. Civ. Stat. art. 4413(36) (Supp. 1974); Va. Code Ann. § 4-80.2 (Supp. 1974); Va. Code Ann. §§ 59.1-21.8 to 59.1-21.18 (Supp. 1974); Wash. Rev. Code §§ 19.100.010 to 19.100.940 (1974). The statutes of Connecticut, Delaware, New Jersey, Ohio, Puerto Rico and Washington apply to franchise relationships in general. The statutes of Massachusetts, Minnesota, Nebraska (§§ 53-166.01 to 53-166.17), New York, Oklahoma, South Carolina, South Dakota and Texas pertain to automotive dealerships. Nebraska (§§ 60-1420 to 60-1435) and Virginia (§ 4-80.2) regulate beer and liquor distributorships. Another Virginia law (§§ 59.1 - 21.8 to 59.1 - 21.18), entitled the "Virginia Petroleum Products Franchise Act", applies to the relationships between "dealers" and "distributors" of gasoline products and, in many instances, contains exactly the same language as the Maryland Law. The great majority of these statutes deal directly with the problem of failure to renew (or continue) the agreement between the distributor and dealer. (Virginia [§ 4-80.2] and South Dakota only forbid cancellation and not refusal to renew). Several make it unlawful for the distributor to refuse to renew the agreement without just cause (just provocation; good cause; due cause, etc.). *See, e.g.* Massachusetts. Others forbid non-renewal without just cause. *See, e.g.* Connecticut ("No franchisor shall . . . fail to renew a franchise, except for good cause. . . ."). While several of these statutes allow

any substantiation was necessary, that the 1973 Act was not concerned with renewal of the agreements.

The judge below was of the opinion that a marketing agreement which did not contain a renewal clause was not subject to § 167E (8) of the Act. He said:

> "If the Legislature intended to stop a company from having a marketing agreement with a dealer that automatically terminated at the end of a specific time, it is up to the Legislature to so state.

---

for possible revocation of the distributor's license for unjust failure to renew, most provide a remedy by way of a suit for damages and/or injunctive relief. Only Delaware, however, explicitly spells out that the equity court may issue "a mandatory order for renewal of the franchise." A few also require notification of intent not to renew within 60 days of the expiration of the contract. The New Jersey law, which provided the model for S.B. 820, is violated by failure to renew without having first given 60 days written notice of non-renewal. Only Maryland (prior to 1 July 1974) and Virginia fail to face directly the problem of non-renewal. Under the Virginia statute (§§ 59.1-21.8 to 59.1-21.18) no distributor may fail to renew a franchise without 60 days written notice in advance of failure to renew. Virginia, like Maryland, allows a civil suit for damages and "other remedies legal or equitable . . . as may be available to the party damaged by such violation." Virginia, however, provides for liquidated damages of $500 and makes explicit provision for "injunctive relief". By passing the 1974 amendment, the Legislature put Maryland among those states that provide remedies both for untimely notice and "unreasonable refusal to renew". The remedy in either case would be accorded under § 167-I.

These statutes and others regulating franchises have received increasing law review treatment. See, *e.g.,* Chisum, *State Regulation of Franchising: The Washington Experience,* 48 Wash. L. Rev. 291 (1973); Comment, *Franchise Regulation: An Appraisal of Recent State Legislation,* 13 B. C. Ind. & Com.L.Rev. 529 (1972); Note, *Constitutional Obstacles to State "Good Cause" Restrictions on Franchise Termination,* 74 Colum. L. Rev. 1487 (1974); Note, *Franchise Terminations and Refusals to Renew: The Lanham Act and Preemption of State Regulation,* 60 Iowa L. Rev. 122 (1974); Note, *A Sui Generis Approach to Franchise Terminations,* 50 Notre Dame Law 545 (1975); Comment, *Mariniello v. Shell Oil Co.,* 6 Rutgers Camden L. J. 155 (1974); Note, *Court Restricts Right of Franchisor to Terminate Franchise — A Prelude to the Franchise Practices Act?,* 4 Seton Hall L. Rev. 683 (1973); Note, *A Tempest in a Chicken Bucket: Some Reflections on Franchise Regulation in California,* 17 U.C.L.A.L.Rev. 1101 (1970); 45 Miss. L. J. 252 (1974); 27 Rutgers L. Rev. 518 (1974). Several of these works question the constitutional validity of statutes which proscribe non-renewal without just cause. We are not faced here with any question of the constitutionality of the renewal provisions.

As of 1 July 1975, the Gasoline Products Marketing Act will appear as §§ 11-301 to 11-308 of the new Commercial Law Article with stylistic changes. Present § 167E (7) will read as follows: "The distributor may not unreasonably withhold his consent to any assignment, transfer, sale, or renewal of a marketing agreement."

It would appear that the problem presented to the Legislature was one where the marketing agreement contained a renewal clause and that the Legislature was trying to make sure that under a renewal clause the minimum time necessary for notice was 90 days.

To further interfere with a contractual right to have a marketing agreement that does not renew itself at all but terminates at the end of the term would not in itself be against public policy unless so declared by the Legislature. The Legislature has not seen fit at this time to enter into this field as Subsection 8 of Article 167E only deals with the nonrenewal of a marketing agreement which, in this Court's opinion, must be interpreted to mean a marketing agreement that has within its provisions the renewal terms. If there was no renewal agreement within the terms of this marketing agreement, it was not even necessary that any notice be sent to the Plaintiff that the lease would cease at the end of the term of the marketing agreement."

As we have indicated, we see it differently. We find it clear that the legislative intent in the 1973 Act, although not concerned with the problem of refusal to renew an agreement, did, in precise terms without equivocation or ambiguity, provide that every marketing agreement executed after 1 July 1973 shall be subject to the giving of notice by one party to the other, at least 90 days prior to the termination of that agreement, of his intent not to renew the agreement, whether or not such clause was expressly set forth therein. Thus the agreement between Crown and Becker, executed on 3 July 1973, was subject to the notice demanded by § 167E (8).[9]

9. Present § 167E (8) will become § 11-304 (F) of the new Commercial Law Article with only stylistic changes. We note that the new wording of § 11-304 (F), entitled "Notice of intent not to renew", confirms our interpretation of the applicability of § 167E (8) to all marketing agreements: "A party who intends not to renew a marketing agreement

Crown and Becker stipulated, see *supra*, that notice was not given as required by § 167E (8).[10] Our inquiry now turns to the effect of the failure to give timely notice.

It is manifest that if an agreement contains a clause providing for an additional term for a stated period, the renewal clause contained in the agreement would become effective in the absence of notice pursuant to § 167E (8). But the agreement here did not contain a clause renewing the agreement or continuing it for a stated period. By its terms it terminated on 30 June 1974. Although Becker was entitled to be notified by Crown that the relationship between them was at an end as of that date, he was not entitled under the 1973 Act to have the agreement renewed or continued. His redress under that Act was set out in § 167-I for violation of a provision of the Act:

> "Any person who violates any provision of this subheading shall be civilly liable for damages caused as a result of the violation, or be subject to other remedies legal or equitable as may be available to the party injured by the violation. Any person suffering damages as the result of the wrongful or illegal termination or cancellation of a marketing agreement or as the result or any other violation of the provisions of this subheading may bring an action under this section against the other

shall give notice of his intent to the party at least 90 days before the expiration of the term of the marketing agreement." The phrase "With respect to nonrenewal of a marketing agreement", which the lower court apparently read as restricting the application of § 167E (8) to agreements with a renewal clause, does not appear in the stylistic revision.

10. The manner of giving this notice was not specified by the statute. The general rule is that when a statute requires the giving of notice, but does not expressly direct the manner it is to be given, the person to be informed must receive actual notice before it will be effective. 58 Am. Jur. 2d *Notice* § 27 (1971), citing among other cases, Johnson Service Co. v. Climate Central Const. Inc., 478 S.W.2d 643, 645 (Texas 1972). See Com. De Astral v. Boston Met. Co., 205 Md. 237, 253. Compare Art. 23, § 167H which provides that where the notice there required is given by certified mail, "the notice shall be effective on the date of mailing."

Patently the parties here applied the general rule. The notice given Becker by Crown was sent by certified mail more than 90 days prior to the expiration term of the agreement but received by Becker less than 90 days prior to the expiration term of the agreement.

> party in the circuit courts of the several counties or the Supreme Bench of Baltimore City or where the offending party resides or has his principal place of business."

The agreement was not wrongfully or illegally terminated or cancelled during its term (it terminated at the time agreed upon by the parties as set out in the agreement) and so Becker was not entitled to any remedy designated therefore by § 167F. He is, however, entitled to such damages, if any, he can prove in a civil action for the failure to notify him of the intent on the part of Crown not to renew the agreement. In the light of the intent of the legislature as we have found it, we do not believe that he is entitled to the equitable relief of a renewal of the agreement. Whether he would be so entitled in a comparable factual posture under the Act as amended in 1974 is not before us, and we expressly do not reach that question.

*Other Issues*

Crown argues that even if § 167E (8) were applicable, "the 90 day notice called for thereunder was fully furnished as of July 4 or 5, 1974 at which time the marketing agreement terminated by its own terms." The statute required that the notice be given at least 90 days *prior* to the expiration of the term of that marketing agreement, and it was agreed that this was not done.

Crown makes an additional alternative argument. It claims that the notice it gave was sufficient to terminate the agreement for cause under Art. 23, § 167G (3) and (4) and § 167H. It urges that any finding of the court below to the contrary was clearly erroneous. Section 167G concerns defenses to an action based on termination of a marketing agreement.[11] Section 167H provides that neither party may

---

11. Art. 23, § 167G reads:

"It shall be a defense to any action brought under the provisions of this subheading that the marketing agreement was terminated or cancelled because:

(1) Of a mutual agreement between the parties;
(2) Of the bankruptcy or insolvency of the dealer;

raise any defense set out in § 167G "unless it shall give written notice to the other party in person or by certified mail of its intent to terminate or cancel at least 60 days prior to the date on which it intends to terminate or cancel the marketing agreement. . ." with the proviso we have set out *supra.* We observe that the action here reviewed was not brought under the provisions of the Act that the agreement was terminated or cancelled and the sections dealing with defenses which may be raised to such actions are not appropriate. As we have indicated, however, the agreement here expressly provides for termination prior to the end of its term. Its ¶ 21 sets out in 18 subparagraphs circumstances under which Crown could "immediately terminate this Agreement without further demand" upon written notice which "shall not be less than is required by applicable State law, if any." Paragraph 22 reads:

> "Where termination is not otherwise specifically provided for in this Agreement and Dealer defaults by reason of a failure to perform or a violation of any provision, covenant or condition of this Agreement and fails to cure the default within such reasonable period of time as may be specified by Crown for correction or thereafter repeats the same violation, Crown may immediately terminate this Agreement without further demand, upon giving Dealer such written notice of termination as may be required by the applicable State law." [12]

The trial court said in its opinion:

> "Extensive testimony was given by both sides in this case — that on behalf of the Defendant alleging that there was cause to terminate the lease

---

(3) The dealer failed to comply with the express requirements of his agreement with the distributor; and

(4) The dealer failed to act in good faith in carrying out the terms of his agreement with the distributor."

12. Paragraph 23 gives Crown relief by way of automatic termination for the dealer's inability to perform, as, for example, by the dealer's death, incapacity by reason of illness or disability or being called into active military service.

agreement, and that on the part of the Plaintiff alleging that there was not cause to terminate the lease agreement. Without going deeply into detail, it is this Court's opinion and ruling in this matter that: (1) Sufficient cause did not exist for the termination of this lease for cause; and (2) that there was no intent at any time on the part of the Defendant to terminate for cause.

A reading of the lease and the entire background of this case leaves this. Court with but one conclusion and that is that the Defendant was disgusted with some of the conduct of the Plaintiff and in fact made efforts to correct certain problems existing in the handling of the station by the Plaintiff, but when Defendant finally decided to terminate the lease it was done entirely with the idea of giving the Plaintiff a ninety (90) day cancellation notice to terminate the lease at the end of its term. Nothing in the Notice of Cancellation made any mention of what cause was being used to terminate the lease, nor under the provisions of Article 23 Section 167 was there any indication that there was an intent to terminate for cause."

We have reviewed the evidence adduced. Giving due regard, as we are directed by Rule 1086, to the opportunity of the lower court to judge the credibility of the witnesses, and bearing in mind that the weight of the evidence is for the trier of fact, we find evidence sufficient in law to support the determinations of the trial court that there was neither an intent shown on the part of Crown to terminate the agreement for cause nor was there sufficient reason established for it to so terminate the agreement even had it so intended. Therefore, the judgment of the trial court that "sufficient cause did not exist for the termination of this lease for cause" stands as not clearly erroneous. *Id.*

Becker filed a motion that we not receive or hear oral argument on the questions Crown presented in its brief going to the point of cancellation for cause and the

constitutionality of Art. 23, § 167E (8). He claims that these matters could only be raised on cross-appeal and because Crown did not cross-appeal they are not properly before us. The challenged matters were tried and decided below and presented by Crown as alternative arguments. The motion is denied.

> *Judgment modified; rights of the parties declared to be as expressed in this opinion; costs to be paid by appellee.*