756 A.2d 548

**James V. GRIESI**

v.

**ATLANTIC GENERAL HOSPITAL CORPORATION.**

**No. 128, Sept. Term, 1999.**

Court of Appeals of Maryland.

July 25, 2000.

Suzanne M. Tsintoas, Silver Springs, for appellant.

Robert H.B. Cawood (Roy L. Mason of Mason, Ketterman & Cawood, P.A., on brief), Annapolis, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL JJ.

HARRELL, Judge.

Mr. James V. Griesi ("Griesi"), Appellant, filed suit in the Circuit Court for Worcester County against Atlantic General Hospital Corporation ("Atlantic General"), Appellee, alleging, among other things, that Atlantic General negligently misrepresented material facts during the course of pre-employment negotiations upon which Griesi relied to his ultimate detriment. Pursuant to Rule 2–322[1] of the Maryland Rules of Civil Procedure, the Circuit Court granted Appellee's motion to dismiss for failure to state a claim upon which relief can be granted. Griesi appealed to the Court of Special Appeals. Before that court considered his appeal, however, we granted certiorari (on our initiative)[2] to consider the following question:

---

1. Rule 2–322 states, in pertinent part:
    (b) Permissive. The following defenses may be made by motion to dismiss filed before the answer, if an answer is required: (1) lack of jurisdiction over the subject matter, (2) failure to state a claim upon which relief can be granted, (3) failure to join a party under Rule 2–211, and (4) governmental immunity. If not so made, these defenses and objections may be made in the answer, or in any other appropriate manner after answer is filed.
    (c) Disposition. A motion under sections (a) and (b) of this Rule shall be determined before trial, except that a court may defer the determination of the defense of failure to state a claim upon which relief can be granted until the trial. In disposing of the motion, the court may dismiss the action or grant such lesser or different relief as may be appropriate.

2. *See Griesi v. Atlantic General Hosp.*, 357 Md. 233, 743 A.2d 245 (2000).

**4**

Whether the trial court erred in its determination that Appellant's Second Amended Complaint fails to state a legally cognizable claim of Negligent Misrepresentation upon which relief can be granted, pursuant to Maryland common law and the Maryland Rule 2–322(b)(2) standard of review?

We hold that Griesi's second amended complaint alleges a cognizable claim under Maryland common law and reverse.

## I.

Griesi filed suit in the Circuit Court for Worcester County on 13 November 1998. He filed a Second Amended Complaint on 5 March 1999 alleging breach of an employment contract (Count I)[3] and negligent misrepresentation in employment negotiations (Count II). According to the allegations of the Second Amended Complaint[4], Griesi, a resident of Montgomery County, is a trained physical therapist who, in August 1998, forwarded a cover letter and resume to Atlantic General, located in Berlin, Maryland, applying for a position as a physical therapist. On 1 September 1998, Griesi telephoned Atlantic General's then Chief Executive Officer (CEO), Mr. Earl Slater, and scheduled an interview for 3 September 1998.

During the interview, Slater and Griesi spoke at length about Griesi's credentials and Slater's desire to train and mentor him. After receiving from Griesi a list of references, Slater took him on a tour of the hospital facilities.

---

**3.** Appellant makes no argument on appeal that the court erred in its ultimate dismissal of the breach of contract claim.

**4.** When ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, the trial judge's task is to decide a question of law solely on the sufficiency of the pleadings. *See Green v. H & R Block, Inc.*, 355 Md. 488, 501, 735 A.2d 1039, 1046 (1999). The judge must assume the truth of the allegations and well-pleaded facts set forth in the complaint, and all reasonable inferences drawn therefrom, and dismiss the complaint if the law provides no relief to the plaintiff even if the facts were proved at trial. *See Morris v. Osmose Wood Preserving*, 340 Md. 519, 531, 667 A.2d 624, 630 (1995). Accordingly, our recitation of the factual background is drawn from Appellant's second amended complaint.

Griesi and Slater next spoke by telephone on 17 September 1998. Slater stated he expected to be able to make an offer of employment soon. He ended the conversation by telling Griesi, "I want you here!" On 21 September 1998 and again three days later, Griesi called to check on the status of the potential offer, but Slater advised he would have to call him back.

Apparently not having pinned all of his hopes at that time on Atlantic General, Griesi had explored the job market elsewhere. He received an employment offer on 24 September 1998 from an entity called MOST, located in Silver Spring, Maryland. Griesi immediately telephoned Slater to see if Atlantic General was prepared to make an offer. Slater responded that he would let him know no later than the next Monday, 28 September 1998.

Between 28 September and 2 October 1998, Griesi and Slater discussed, on several occasions, a proposed specific starting date and starting salary for a management position in Atlantic General's Physical Therapy Department. Slater stated he would present the proposal to the Board of Directors of Atlantic General and get back to him.

On 5 October, Slater, on behalf of Atlantic General, called Griesi and communicated an oral offer of employment as a Physical Therapy Manager to start on 2 November 1998 at an annual salary of $55,000, plus benefits. Slater stated that the chairman of the Board approved the offer. Griesi responded he had offers from other potential employers [5] and would need to think about the offer from Atlantic General. Slater advised that he would forward a written contract offer by the next week.

The next day, Griesi called Slater and orally accepted the 5 October oral offer of employment. On 10 October, he received the promised written offer from Atlantic General, in a letter

---

**5.** It is not clear from the pleading whether Griesi informed Slater specifically of the MOST offer.

signed by Slater, on Atlantic General's letterhead, and dated 7 October 1998. The letter explained, in pertinent part:

> As we have discussed, I am pleased to offer you the position of Physical Therapy Manager at a salary of $55,000 per year effective November 2, 1998. In this full-time position, you will be responsible for all facets of departmental operation.
>
> As you know, I have provided notice to the present contractor [6] in accordance with the ninety day provision in the contract. As a result of an exclusivity clause in the contract with the contractor, you will be unable to render patient care during November until December 23 rd. For this reason, another full-time physical therapist will not join us until this period of exclusivity has expired. Once the period expires, both of you will commence clinical assessments for inpatients, outpatients, and patients on our Long Term Care Unit. In addition, I have shared with you the possibility of providing services to the neighboring nursing home in the future.
>
> Please advise me of your decision in writing at your earliest convenience. I am confident that this opportunity will provide mutual growth opportunities for you and the Hospital.
>
> Sincerely,
>
> [signature of Slater]
>
> Earl B. Slater, Jr.
>
> Interim President/Chief Executive Officer

On 15 October, Griesi responded with an unconditional written acceptance in a letter to Slater.[7]

---

6. Apparently, Atlantic General had been providing physical therapy services to its patients through a contract with an external provider.

7. The complaint additionally avers that, upon acceptance of the Atlantic General offer, Griesi rejected a pending job offer (apparently the MOST offer) and took steps to move his residency to Ocean City. The allegations do not detail whether he actually moved or incurred any costs in taking those steps.

On 20 October 1998, Ms. Kim Justice, a supervisor in the Physical Therapy Department at Atlantic General, telephoned Griesi. She wanted to meet him because the only documentation on him she had were copies of his resume and his 15 October acceptance letter. The next day, Ms. Joan Kindell, Vice President of Human Resources at Atlantic General, telephoned Griesi requesting to join the meeting with Justice. Kindell suggested the three meet on 2 November 1998, the date of Griesi's expected first day of work at Atlantic General. Ostensibly alarmed from these calls about potential delay in starting his employment, Griesi telephoned Mr. Barry Beeman, Atlantic General's new CEO, that same day, but Beeman was unavailable to take the call. Instead, Griesi reached Slater [8], who said he was upset with the way the matter was being handled and assured Griesi that the corporation's Board of Directors approved the offer of employment. Slater asked to be given some time to resolve any misunderstanding.

On 22 October, Slater called Griesi and explained that he spoke with Beeman who expressed concern that Griesi did not have a physical therapy license. Griesi faxed a copy of his license to Slater who said he would forward it to Beeman. On 24 October 1998, Slater telephoned Griesi to say that he had spoken with Beeman again and with the chairman of the Board, and he did not foresee any more confusion between Griesi and Atlantic General. Slater stated that the starting date of Griesi's employment remained valid.

Two days later, Griesi and Beeman discussed the licensing process. Griesi stated he was prepared to begin work on 2 November. Beeman asked if he had scheduled an appointment with Ms. Justice. Griesi replied that an appointment was scheduled for his first day on the job. Beeman responded "we will take it from there."

Griesi met with Justice, Kindell, and a Ms. Soots, Atlantic General's Director of Operations, on 2 November. Soots,

---

**8.** Griesi did not allege when Beeman replaced Slater as CEO of Atlantic General, nor what Slater's role, if any, with Atlantic General became upon being replaced as CEO.

speaking for the three, stated that they had no knowledge that physical therapy services at Atlantic General were to be changed from its present outside contractor to in-house employees; no one knew of Griesi other than from his resume and acceptance letter; Slater never consulted them about hiring him; and, therefore, the purpose of the meeting was "fact-finding." They then interviewed Griesi at length, including the details and chronology of the hiring process he underwent with Slater.

Although conceding that Slater and the Chairman of the Board probably did make the decision to hire Griesi, Soots maintained that she ran the hospital and Justice, Kindell, and herself had to approve potential new hires. She explained that, although she was impressed with Griesi's resume, she doubted whether she had the time or resources to train him. She also stated that Atlantic General recently had hired another physical therapist. Soots said she would call Griesi regarding his status by 6 November 1998, after she consulted with other personnel of Atlantic General.

On 6 November, Kindell telephoned Griesi and told him that Atlantic General decided not to hire him. She advised him that she had forwarded his resume for consideration to the hospital's outside consultant for physical therapy services. Apparently the consultant did not offer Griesi employment as, at the time the second amended complaint was filed in the Circuit Court on 5 March 1999, he continued to allege that he was seeking a job comparable with that Atlantic General had offered.

In paragraphs 46 through 52 of his second amended complaint, Griesi specifically alleged the following as to his negligent misrepresentation claim:

46. Defendant Atlantic through its agent, employee, and acting Chief Executive Officer, Earl Slater, owed a duty of care to Plaintiff Griesi, a job applicant.

47. Defendant Atlantic through its agent, employee, and acting Chief Executive Officer, Earl Slater, negligently misrepresented several present facts during Plaintiff and De-

fendant's employment negotiations regarding Defendant's need for, and desire to employ Plaintiff as, a Physical Therapist Manager.

48. Defendant Atlantic through its agent, employee, and acting Chief Executive Officer, Earl Slater, negligently misrepresented several related present facts at the time the offer of employment was extended to the Plaintiff, including: (1) that Slater was authorized to make an offer of employment and hire employees for Defendant Atlantic; (2) that Defendant's interviewing and selection process was complete; (3) that Defendant Atlantic would not require Plaintiff Griesi to submit [to] further interviews or assessment of his qualifications, or other pre-employment requirements; and (4) upon timely acceptance of Defendant's offer, Plaintiff Griesi could rely on Defendant's performance.

49. Defendant Atlantic made the misrepresentations intending that the Plaintiff would act in reliance on its oral and written representations.

50. Defendant Atlantic could reasonably foresee that the Plaintiff would rely on the misrepresentations.

51. Defendant Atlantic could reasonably foresee that if its representations were false, the Plaintiff would incur injury or loss.

52. Plaintiff Griesi took actions in reasonable and justified reliance on Defendant's negligent misrepresentations, which resulted in his suffering damages.

In the ad damnum portion of the second amended complaint, Griesi sought compensatory damages of "no less than $165,-000."

Atlantic General filed a motion to dismiss Griesi's complaint arguing, among other things, that his count of negligent misrepresentation failed to state a claim upon which relief could be granted. The Circuit Court granted the motion on the ground that Maryland does not recognize the tort of negligent misrepresentation in employment at-will situations.

## II.

### A.

Griesi asserts that he has a valid claim of economic loss due to his reliance on Atlantic General's negligent misrepresentations made to him during pre-employment negotiations. He argues that Slater and he formed a special relationship during employment negotiations which gave rise to Slater's owing him a duty to exercise reasonable care in disseminating information regarding the true employment situation at Atlantic General. Griesi argues that he

> made it abundantly clear during his conversations with Atlantic's CEO that he was actively seeking employment and had at least one other offer pending. It is not unreasonable to presume that Griesi would probably rely on information provided to him by Atlantic's CEO in making a career decision about which corporation could best me[e]t his present and future, personal and professional, needs and plans. Businessmen routinely rely on statements made about the workings of a corporation by its Chief Executive Officer. Due to the nature and purpose of the relationship between the parties, it is clear that if the CEO voluntarily gave specific, relevant and persuasive information to Griesi about the corporation in the course of their serious and deliberate negotiations, and Griesi relied on that information to make a decision about whether to enter into a contract with Atlantic, and that information was false, as is alleged in the Appellant's Second Amended Complaint, foreseeable and considerable harm would undoubtedly befall the Appellant.

Appellant's Brief at 17.

Atlantic General responds that Griesi's negligent misrepresentation claim is not cognizable under Maryland's employment at-will jurisprudence. Under the at-will doctrine, the employer or employee may terminate the employment relationship for any reason unless prohibited by law or public policy. This principle, Atlantic General suggests, applies at any time during the course of the employer-employee relation-

ship, including pre-employment negotiations. Atlantic General envisions an assault of "massive litigation in Maryland" if this Court recognizes negligent misrepresentation as a viable cause of action in the present case. We do not share Atlantic General's reasoning or alarm.

We have explained that, in its most general sense, negligent misrepresentation arises when the defendant owes a duty of care in communicating information to the plaintiff and that duty is breached, causing pecuniary or personal injury to the plaintiff. *See Village of Cross Keys, Inc. v. U.S. Gypsum Co.,* 315 Md. 741, 755–57, 556 A.2d 1126, 1131 (1989); *Weisman v. Connors,* 312 Md. 428, 443–48, 540 A.2d 783, 790–93 (1988)(discussing the history of negligent misrepresentation in Maryland); *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 334–37, 439 A.2d 534, 538–39 (1982). It has been said that "the most common example of the duty to speak with reasonable care is based on a business or professional relationship, or one in which there is a pecuniary interest." *Giant Food, Inc. v. Ice King, Inc.,* 74 Md.App. 183, 190, 536 A.2d 1182, 1185 (1988)(discussing Prosser and Keeton on the Law of Torts § 107, at 105 (5th Ed.1984, 1988 Supp.)).

In *Weisman,* we reaffirmed the five elements of negligent misrepresentation as:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

312 Md. at 444, 540 A.2d at 791 (citing *Martens Chevrolet, Inc.,* 292 Md. at 337, 439 A.2d at 537). *See also Village of Cross Keys, Inc.,* 315 Md. at 755–56, 556 A.2d at 1133.

## B.

▇▇ A claim sounding in negligence requires that the defendant owe the plaintiff a duty of care. "[I]t should be recognized that 'duty' is . . . an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Jacques v. First Nat. Bank of Maryland,* 307 Md. 527, 533, 515 A.2d 756, 759 (1986)(citing Prosser and Keeton on The Law of Torts § 53, at 357 (1984)). In *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 142, 753 A.2d 41, 63 (2000), we recently had the occasion to reiterate a long held legal principle:

> [T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury. . . . As the duty varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty.

(citations omitted). *See also Village of Cross Keys, Inc.,* 315 Md. at 751–52, 556 A.2d at 1131.

▇▇ There is no precise formula for determining the existence of a duty of care between two parties. *See Williams,* 359 Md. at 126–27, 753 A.2d at 54–55; Dan B. Dobbs, The Law of Torts § 472, at 1350 (2000). At a minimum, we have endorsed an analytical approach that encompasses at least two major assessments: examining the nature of legal relationship between the parties and the likely harm that results from a party's failure to exercise reasonable care within that relationship. *See Jacques,* 307 Md. at 534, 515 A.2d at 759. For claims of economic loss due to negligent misrepresentation, the injured party must prove that the

defendant owed him or her a duty of care by demonstrating an intimate nexus between them. *See Jacques,* 307 Md. at 534–35, 515 A.2d at 759–60.

The intimate nexus may be demonstrated by showing contractual privity or its equivalent. *See Weisman,* 312 Md. at 446, 540 A.2d at 791; *Jacques,* 307 Md. at 534–35, 515 A.2d at 759–60. Maryland has found the equivalent of contractual privity in special relationships consummated during the course of pre-contract negotiations. *See Weisman,* 312 Md. at 448–51, 540 A.2d at 792–94 (holding that negligent misrepresentation is a viable cause of action in pre-contract employment negotiations); *Martens Chevrolet, Inc.,* 292 Md. at 331–338, 439 A.2d at 536–39 (facts were sufficient for a jury to determine negligent misrepresentation in pre-contractual negotiations where defective financial statements were presented to buyer of a car dealership); *Lubore v. RPM Assoc., Inc.,* 109 Md.App. 312, 338, 674 A.2d 547, 560 (1996)(holding that employer could be liable to employee who resigned from former job in reliance of employer's negligent misrepresentation); *Giant Food, Inc.,* 74 Md.App. at 190–91, 536 A.2d at 1185 (formation of actual contract immaterial to finding of duty if facts sufficient for jury to find special relationship developed between buyer and supplier of ice because of extensive and detailed communications).

Finding an intimate nexus requires consideration of numerous factors. *Weisman* cited *International Products Co. v. Erie R. Co.,* 244 N.Y. 331, 155 N.E. 662, 664 (1927) for guidance in determining whether a duty exists between two parties based on such a nexus:

"Liability [for negligent misrepresentation] arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals

and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care. An inquiry made of a stranger is one thing; of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, is another."

312 Md. at 447, 540 A.2d at 792.

Furthermore, Dobbs has advised that:

Clarity in stating and applying the duty can also be improved by recognizing that falsity does not by any means prove negligence. The defendant's representation might be erroneous because the defendant (1) did not know the facts he should have known, failed to investigate facts, or investigated them with less than reasonable care; (2) knew the facts but used words or other communicative devices poorly; or (3) unreasonably failed to make statements at all, or failed to make statements needed to clarify the plaintiff's understanding.

Dan B. Dobbs, The Law of Torts § 472, at 1353 (2000).

The Restatement (Second) of Torts § 552, Comment (a), at 128 (1977), in explaining the scope of liability for negligent misrepresentation as being more narrow than that of fraudulent misrepresentation, states, in pertinent part:

[I]t does not follow that every user of commercial information may hold every maker to a duty of care. Unlike the duty of honesty [under a fraudulent misrepresentation action], the duty of care to be observed in supplying information for use in commercial transactions implies an undertaking to observe a relative standard, which may be defined only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect. A user of commercial information cannot reasonably expect its maker to have undertaken to satisfy this obligation unless the terms of the obligation were known to him. Rather, one who relies upon information in connection with a commercial transaction may reasonably expect to

hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose.

By limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he [or she] manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests. The limitation applies, however, only in the case of information supplied in good faith, for no interest of society is served by promoting the flow of information not genuinely believed by its maker to be true.

In the context of an employment relationship, we held in *Weisman* that an employer may be obligated to exercise reasonable care in making representations to a prospective employee during pre-employment negotiations. *See* 312 Md. at 449, 540 A.2d at 793. We analogized the duty in an employment situation, where the employer negligently misrepresented facts to a prospective employee before the employee accepted the offer of employment, to the New York case of *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922), which held that a public weigher of goods, acting on behalf of the seller, can be held liable for negligent misrepresentation to a buyer of goods. *See Weisman*, 312 Md. at 446, 540 A.2d at 792. In *Glanzer*, because the weigher and buyer intimately were engaged in a business transaction, the New York Court of Appeals found that the weigher, in order to properly facilitate the transaction, owed a duty of care in conveying accurate information to the buyer. *See id.* The sharing of such information, the Court held, can create an intimate bond "so close as to approach that of privity, if not completely one with it." *Id.*

In *Weisman* we recognized that, like a contract for the sale of goods, the employer-employee relationship is a business transaction, where a special relationship may develop giving

rise to a duty to exercise reasonable care in facilitating the transaction. Depending on the market, it is usually the future employer's objective to "sell" the prospective employee, prior to the formation of an employment relationship, on the benefits and wisdom of working for the employer. *See* 312 Md. at 449, 540 A.2d at 793. We explained that pre-contractual employment negotiations manifestly require the employer to impart, and the prospective employee to digest, relevant and accurate information concerning the place of employment and the position to be occupied by the employee. *See id.* A prospective employee has a great stake in obtaining accurate information from his or her potential future employer and an employer reasonably should foresee that negligent misrepresentation of employment information may result in economic harm to the prospective employee. *See id.*

Our decision in *Weisman* is controlling in the case *sub judice*. We hold that the allegations in Griesi's second amended complaint, assumed as true for present purposes, are sufficient to make out a prima facie case of negligent misrepresentation. The facts as alleged support a conclusion that an intimate nexus between Atlantic General, in the person of Slater, and Griesi was formed in pre-employment negotiations. The intensive communications between the two parties regarding the physical therapist position were apparently at arm's length. In addition to a personal interview, on 3 September 1998, Slater and Griesi contacted each other several times by telephone before an unequivocal oral offer was extended on 5 October 1998. Prior to 5 October, Slater presented a starting date and salary, and informed Griesi that he was bringing the issue of hiring him to the Board of Directors for approval. The oral offer that followed was made under the further authority of approval by the chairman of the corporation's board. Griesi told Slater that he would need some time to decide whether to accept Atlantic General's offer because he had other job offers. Slater, moving to close negotiations, promptly memorialized Atlantic General's oral offer in a letter to Griesi. Griesi, relying on Slater's representations, ultimately turned down MOST's employment offer and accepted

Atlantic General's offer. Unfortunately, as alleged, there may not have been a position at Atlantic General, of the type offered to Griesi, at anytime pertinent to the negotiations.

We weigh heavily in our analysis that Atlantic General had exclusive control of vital and material information necessary for Griesi fully to understand the situation, and that it never disclosed such information to Griesi. *See* Dan. B. Dobbs, The Law of Torts § 472, at 1353 (2000)(discussing the failure to disclose facts may be a negligent act). Slater may have misrepresented that a position was available and that he had authority to make the offer of employment. Griesi put confidence in the accuracy of Slater's positive and unequivocal representations of an employment opportunity and that he had authority, or apparent authority, to make such an offer, either in his capacity as CEO alone or with the approval of the Board and its chair (and impliedly without approval from Soots, Kindell, and Justice). A reasonable inference to draw from these allegations is that Slater knew or should have known that Griesi, relying on Atlantic General's offer, might turn down other job offers to work for Atlantic General. A jury could find from the facts as alleged, if proven, that Griesi reasonably relied on Slater's special knowledge of the employment situation at Atlantic General and that Slater accepted and was conscious of Griesi's reliance as a basis for the "deal."

We reject Atlantic General's suggestion that *Weisman* only applies to employment contexts involving high-level executives or to fixed term employment contracts. We did not confine our holding in *Weisman* so narrowly, nor did we squarely discuss there at-will employment situations. The Court of Special Appeals, in *Lubore,* considered an argument similar to Atlantic General's in the present case. In *Lubore,* Jeffrey M. Lubore, appellant, sued RPM Associates, Inc., appellees, for negligently misrepresenting several terms of employment during pre-contractual negotiations that were revealed to him only after he accepted appellees' lucrative offer of employment, resigned from a secure, high salary job, and started working for appellees. Despite finding that the employment contract between appellant and appellees was at-will employ-

ment, the court held that appellant's claim of negligent misrepresentation was viable in light of *Weisman:*

> Appellees attempt to distinguish *Weisman* from the instant case. They point out that in *Weisman* the employee had a fixed three-year contract, whereas here appellant was an at-will employee. In this regard, appellees argue: (1) that *Weisman'* s holding that an intimate nexus existed was based, in part, on this fact, *id.* at 450, 540 A.2d 783; and (2) citing Stanley Mazaroff, Maryland Employment Law [9] that the Court's holding would have been different if the employee was merely an at-will employee. Although *Weisman* considered the fact that the contract was one for long-term employment, we do not read *Weisman* to eliminate, in all cases, the existence of an "intimate nexus" when the parties are high-level executives negotiating for at-will employment. *Weisman* simply does not address the issue. We disagree that the overriding (and distinguishing) factor in *Weisman* was that the contract was for a fixed term of years. Rather, our reading of the case leads us to conclude that the real focus in *Weisman* was on the importance of the accurate exchange of information in light of the relationship and the

---

**9.** Atlantic General cites to Stanley Mazaroff, Maryland Employment Law, § 5.6(B), at 401 (1990), for the same proposition that appellees in *Lubore* did. Mazaroff states:

> While the Court in *Weisman* opened the door to claims of negligent misrepresentation in pre-employment contract negotiations involving high-level executives seeking fixed-term contracts, it is doubtful that the door has been opened as well as to claims for negligent misrepresentation by the rank and file applicants for at-will employment. Because at-will relationships can be terminated by an employer for any reason which does not violate public policy or some statutory prohibition, as a matter of law, applicants for at-will positions cannot claim that they were injured by reason of the employer's failure to satisfy an allegedly negligent representation. Stated otherwise, pre-employment discussions and negotiations between employers and applicants for at-will positions do not create the "intimate nexus" between the parties. . . .

In response to *Lubore*, the 1998 Supplement of the Mazaroff treatise recognizes that *Weisman* may not be as confined as once thought. *See* Stanley Mazaroff, Maryland Employment Law, § 5.6, at 91–92 (1990, 1998 Supp.).

nature of the harm that could result from the defendant's negligence. *See id.* at 446, 449, 540 A.2d 783.

*Lubore,* 109 Md.App. at 337–38, 674 A.2d at 559–60.

In the context of the present case, we agree with the reasoning in *Lubore* and its insight as to what was implicit in *Weisman.* The essence of Griesi's claim against Atlantic General is not whether the parties formed an employment contract, but rather that Atlantic General failed to exercise reasonable care in communicating information to him that was material to his business decision whether to accept the offer for the in-house, managerial physical therapist position, that he relied on those misrepresentations, and suffered injury as a result of that reliance.[10]

Contrary to Atlantic General's prediction that allowing Griesi's claim to proceed undermines the employer's right to terminate the master-servant relationship, the employment at-will doctrine nonetheless will retain its full vitality in Maryland. The employment at-will relationship will continue to be viewed as arising from contract, terminable by either the employer or employee at any time. *See Adler v. American Standard Corp.,* 291 Md. 31, 35, 432 A.2d 464, 467 (1981). Atlantic General, however, attempts here to impose the doctrine as a bar to accountability for what may be its negligent

---

**10.** Several federal and state courts have allowed or recognized employee negligent misrepresentation claims against employers in an at-will employment context. *See Trytko v. Hubbell, Inc.,* 28 F.3d 715, 721–22 (7th Cir.1994); *Abdulrahim v. Gene B. Glick Co., Inc.,* 612 F.Supp. 256, 263–64 (N.D.Ind.1985); *Branch v. Homefed Bank,* 6 Cal.App.4th 793, 8 Cal.Rptr.2d 182, 184 (1992); *D'Ulisse–Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 520 A.2d 217, 223–24 (1987); *Eby v. York–Division, Borg–Warner,* 455 N.E.2d 623, 628–29 (Ind.Ct. App.1983); *Levens v. Campbell,* 733 So.2d 753, 762–63 (Miss.1999); *Miksch v. Exxon Corp.,* 979 S.W.2d 700, 706 (Tex.App.1998); *Pearson v. Simmonds Precision Prod., Inc.,* 160 Vt. 168, 624 A.2d 1134, 1136–37 (1993).

Some courts have allowed reliance claims by employees against employers under a theory of promissory estoppel. *See Comeaux v. Brown & Williamson Tobacco Co.,* 915 F.2d 1264, 1272–73 (9th Cir. 1990); *Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114, 116 (Minn. 1981).

conduct. The employer's post-employment right to terminate the employment relationship logically or legally cannot immunize the employer from liability for a tort committed before the termination occurred. Atlantic General's argument in this regard likely will have a substantial bearing on the amount of any damages, but it has no effect whatsoever on whether he has plead a cognizable claim. The issue of the amount of any damages is not before us in the procedural posture in which this case reaches us.

## C.

Our discussion *supra* of the duty of care owed by Atlantic General to Griesi largely pollinates the other elements of the tort of negligent misrepresentation. A jury could find, based on proof of Griesi's allegations, that Slater intended that Griesi act upon Atlantic General's offer of employment, as demonstrated by the offer letter he sent backing up his earlier oral offer. Furthermore, Slater was aware of Griesi's other contemporaneous employment offer (or offers). In reliance on Slater's representations, it was foreseeable that Griesi might suffer some economic injury, having rejected the other offer(s), if his employment offer from Atlantic General was a nullity.

The element of justifiable reliance merits further comment. Atlantic General argues that the statements made by Slater were predictive in nature, rather than a false statement of past or present facts. It states that:

> Assuming that the statements made by Slater were true at the time they were made, the appellant has not stated a cause of action for negligent misrepresentation, since any misrepresentation would be for a future event. The only promise made to the appellant was that he would have an at-will job. Since Griesi could be terminated at-will, all of the statements made to him were predictive in nature and simply expected to come true. These statements cannot supply one of the elements of a cause of action for negligent misrepresentations.

We disagree. The alleged statements made by Slater illustrate that he may have made false statements regarding present facts. Slater represented that a job position actually was available during the time he negotiated with Griesi, up to the point he extended an offer, and that he had actual or apparent authority to extend that employment offer. The temporizing allusions in Slater's 7 October letter regarding limitations on Griesi's ability to render patient care between 2 November and 23 December 1998 (because of contractual obligations with the outside consultant) did not mean that Griesi was not offered a job on 2 November. In Griesi's post-acceptance meeting with Soots, Kindell, and Justice, he was informed that these high placed supervisory personnel were unaware that Atlantic General was bringing the provision of physical therapy services in-house, rather than continuing with its outside contractor. An inference could be drawn that no position was available for Slater to offer. Furthermore, Soots stated that no one could be hired by Atlantic General without approval from Soots, Kindell, and Justice. If this is true, Slater's representations as to his actual or apparent authority to extend an offer may have been false.

We conclude, therefore, that Griesi has plead sufficiently facts that, if proven and believed, satisfy the elements of the tort of negligent misrepresentation. On the element of injury, Griesi has plead facts, sufficient to survive a motion to dismiss, that he may have suffered consequential damages in reliance on Slater's representations.

JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEE.

CATHELL, Judge, dissenting:

I respectfully dissent. In my view, the majority strains to expand the holding in *Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988). Under the majority's holding, had the hospital put Griesi, or any other lower or middle level employee, on

the payroll and then terminated him the next day, it may have been insulated from suit. The mere allegation of promises causes the hospital to be subject to suit arising out of the interviewing procedure for an "at will" position, unless it first puts the prospective employee on the payroll, then fires him. It is, as I see it, a nonsensical situation.

There is an even more serious problem that may arise from the holding. Anyone who applies for an "at will" position will have a cause of action if not hired, based solely on allegations of misrepresentation. This decision will open the flood gates. No employer, however ethical, will be safe from the burden of defending itself against frivolous lawsuits. In my view, the adoption of the majority's position will effectively cause the imminent abrogation of the employment "at will" doctrine in Maryland.

*Weisman* was intended, as I read it, and as it was read by others, prior to the Court of Special Appeals' rush to expand it in *Lubore v. RPM Associates, Inc.*, 109 Md.App. 312, 674 A.2d 547 (1996), to apply only in those rare instances of upper level management employment negotiations. The majority today extends it virtually to all preemployment representations— presumably even representations in employment advertisements.

Every employer, as a result of this opinion, will be well advised to instruct its hiring personnel to hire in silence— based only on written applications and on what an applicant may say. Any representation—any statement, by anyone in the employer's hiring process could subject the employer to suit if an applicant is not hired, even though the position at issue is for employment "at will" and even though the person, if hired, could be fired the next day without cause.

If an employer interviews ten people for one "at will" position and hires the one it feels is best qualified, the other nine can now sue for not being hired based on allegations of some misrepresentation. It is only a minor step—an inevitable step, for the same thing to occur in terminations of "at will" employment as, today, has occurred to situations of

failure to hire for an "at will" position. Any other result would be simply illogical. With the filing of the majority's opinion, the existence of the employment "at will" doctrine in Maryland has entered its terminal stage.

Moreover, lawyers will be unable to advise employer-clients as to just what their status may be in interviewing prospective employees. If we are going to abolish the doctrine, we should say so; not strain to make exceptions, leaving traps for attorneys and trial judges.

I would affirm.

Judge RAKER has authorized me to state that she joins in the views expressed herein.