771 A.2d 508

**Gabriel AKPAREWA, et al.,**

v.

**AMOCO OIL COMPANY.**

**No. 939, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

April 30, 2001.

James L. Parsons, Jr. (Harry C. Storm and Abrams, West, Storm & Diamond, P.C., on the brief), Bethesda, for appellants.

Daniel R. Chemers (Kimberly A. Manuelides and Saul Ewing, LLP, on the brief), Baltimore, for appellee.

Argued before KENNEY, DEBORAH S. EYLER, ADKINS, JJ.

KENNEY, Judge.

This appeal was taken from a decision by the Circuit Court for Baltimore City granting summary judgment in favor of appellee, Amoco Oil Company ("Amoco"), and against appellant, Gabriel Akparewa ("Akparewa"), and from the decision dismissing appellant, Vaga, Inc. ("Vaga"). Akparewa raises three issues on appeal, which we have reworded as follows, and Vaga raises one:

1. When Amoco's violations of the statutory disclosure requirements under § 11–303 of the Commercial Law Article were not in dispute, did the trial court err in granting Amoco, rather than appellant, summary judgment?

2. Did the trial court err in granting Amoco summary judgment on the Dealer Act claim related to Miller and Hartman?

3. Did the trial court err in granting Amoco summary judgment on the negligent misrepresentation claim?

4. Did the trial court err in dismissing appellant Vaga, Inc. for lack of standing?

We find that there was a genuine material dispute of fact such that the grant of summary judgment was inappropriate, but we affirm the circuit court's decision that Vaga, Inc. had no standing.

## FACTUAL BACKGROUND

Akparewa emigrated from Nigeria to the United States in 1977. He graduated from Alabama A & M University in 1980 with a B.S. degree in business administration and received an M.B.A. from Morgan State University in 1983. In early 1996, Akparewa was seeking a business opportunity. After speaking with gasoline dealers who said that the business was profitable, he concentrated his efforts on acquiring a gasoline dealership. Akparewa would visit a station and subsequently contact the owner to inquire if it was for sale and for what price.

### *The Park Circle Amoco*

Akparewa eventually contacted the owner of the Park Circle Amoco gasoline station and convenience store, located at 3312 Reistertown Drive in Baltimore City ("Park Circle Amoco"). Amoco owns Park Circle Amoco and leases it to franchisees. The franchisee at the time of Akparewa's initial inquiries, David Farhat ("Farhat"), indicated at first that he did not want to sell, but told Akparewa to check back. Farhat had been the franchisee since May 9, 1994. Prior to Farhat, the franchisee of the Park Circle Amoco was Owen Ray, who had operated the station for approximately twenty years before transferring it to Farhat.

After some negotiation, Farhat agreed to sell his interest in the Park Circle Amoco for $170,000. Akparewa had done his own market research by evaluating the prices dealers would accept for their stations, the location of the station, whether a convenience store was attached, and the impact of traffic patterns on the location. Akparewa apparently did not ask to see Farhat's books and records and never inquired into the sales figures or other performance indicators from the Park Circle Amoco.[1]

---

1. During discovery, Akparewa invariably stated that he could not recall whether he asked Farhat any questions about the business history of the Park Circle Amoco.

### *The Akparewa/Farhat Contract*

Akparewa's attorney drew up a contract for the sale of the Park Circle Amoco, and he and Farhat signed it on February 5, 1997. Pursuant to the agreement, Akparewa agreed to purchase the business goodwill of the Park Circle Amoco, the equipment, the inventory, and "all right, title and interest in the lease rights between [Farhat] and Amoco." Akparewa paid $10,000 down and was to pay an additional $100,000 at closing. Farhat financed the additional $60,000 of the purchase price. Closing was contingent upon Amoco's consent to the assignment of the franchise:[2] "Closing will only take place after Amoco has finally approved the sale of the business from [Farhat] to Buyer." Farhat was to deliver, at closing, the following document: "the consent by Amoco Oil Company ("Amoco") to the assignment to Gabriel Akparewa by and between Amoco and David M. Farhat on terms satisfactory to the Buyer."

After concluding the contract with Farhat, Akparewa contacted his cousin, Valentine Korie, and asked if he would be interested in becoming a co-owner of the business. Korie agreed, and they formed a corporation, Vaga, to operate the business.

### *Akparewa/Amoco Disclosure*

Akparewa delivered a copy of the contract with Farhat to Amoco's offices in Towson. Amoco responded by sending Akparewa a dealer application, a blank business plan, and a disclosure statement.

Amoco's disclosure statement provided information about the Park Circle Amoco and the contemplated franchise.[3] In particular, the disclosure statement provided Park Circle Amoco's gallonage history for only the two most recent calendar years, that is, 1995 and 1996. It did not include the

---

2. Amoco's form franchise agreement requires Amoco's consent to any transfer of the franchise.

3. Akparewa was to have a trial franchise contract for the first year.

gallonage for 1994. It provided Farhat's name and address, but not that of the prior franchisee, Owen Ray. Amoco's disclosure statement also indicated that it retained the right to "encourage" Akparewa to use particular vendors but that he would not be obligated by contract to use those vendors.

After Amoco approved Akparewa's dealer application and business plan, Akparewa closed on the Farhat contract. He signed Amoco's one year trial franchise contract (the "Agreement") on or about July 15, 1997. Vaga was not a party to the Agreement, which specifically named Akparewa as the lessee/franchisee. The Agreement also provided that it could not be assigned without Amoco's prior written consent.

### Akparewa's Operation of the Park Circle Amoco

Akparewa began operating Park Circle Amoco on or about July 15, 1997. Akparewa had purchased the existing inventory of the store as part of the transaction with Farhat, and he purchased subsequent inventory on an as-needed basis from various vendors.

During the course of the year, Akparewa worked with Amoco's representative, Stephen Brown, who periodically checked on the operation of the Park Circle Amoco. Amoco also employed "mystery shoppers" to evaluate the store's operation. No negative evaluations were given by the mystery shoppers, but Brown was not satisfied with the manner in which Akparewa was running his store. Brown noted several problems with the store; for example, the store was not clean, shelves were empty, merchandise was not placed on the shelves facing the customer, and merchandise was not labeled with a price. Akparewa contends that Brown kept telling him to "re-merchandise" and that he do so through an entity identified as Miller & Hartman, a vendor with which Brown was familiar. Akparewa initially declined to do so.

On September 19, 1997, Brown visited the store and discussed ongoing problems with Akparewa. He also wrote a note stating that the store should be re-merchandised and that the "lease is in jeopardy of being canceled." Akparewa then

agreed to use Miller & Hartman. To do so, Akparewa had to order a week's supply of inventory in advance, rather than purchasing on an as-needed basis. Akparewa contends that purchasing inventory in this manner ended up being costlier than his earlier system, which, in turn, caused his automatic gasoline payments to Amoco to be returned for insufficient funds ("NSF"). Akparewa had a total of eight NSF drafts on the gasoline account.

In addition to the problems with the convenience store operation, Brown advised that Akparewa generally "didn't have a handle on the gasoline end of the business." For example, Akparewa apparently was not completing daily inventory reconciliation sheets, a requirement under the franchise agreement.

Akparewa eventually straightened out the NSF problem, but Amoco, upon Brown's recommendation, declined to renew the trial franchise. Amoco did allow Akparewa to continue operating the store until October 30, 1998, approximately three and a half months after the expiration of the trial franchise on July 14, 1998. Akparewa contends that when he presented Amoco with a buyer for the business, Amoco rejected the buyer, causing Akparewa to lose his investment in the business.

### *Procedural History*

Akparewa filed a complaint against Amoco on September 28, 1998, in the Circuit Court for Baltimore City. His complaint, alleging breach of the Agreement, requested one million dollars in damages and that Amoco be enjoined from terminating the Agreement.[4] A first amended complaint was filed on January 21, 1999. That complaint alleged that Amoco violated the Maryland Gasohol and Gasoline Products Marketing Act, committed fraud through concealment, and committed constructive fraud. Akparewa filed a second amended com-

---

4. There is no record of any response by Amoco to the complaint filed on September 28, 1998.

plaint on October 25, 1999, adding a claim of negligent misrepresentation.

On February 19, 1999, Amoco filed both an answer to the amended complaint and counterclaims for negligent or intentional fraud or misrepresentation and for indemnification. On August 5, 1999, Amoco subsequently amended its counterclaims to include an allegation of breach of contract.

Both Akparewa and Amoco filed motions for summary judgment on December 2, 1999. On March 3, 2000, the court, after a hearing, entered an order granting summary judgment in favor of Amoco on all counts of Akparewa's complaint and on Amoco's counterclaim for breach of contract. The court then set the matter for a trial on damages only on Amoco's breach of contract claim.

The trial on damages took place on May 23, 2000. The jury awarded Amoco the sum of $8,006.09, and a judgment in that amount was entered the same day.[5] Both parties filed timely appeals. Amoco has subsequently dismissed its cross-appeal.

## Discussion

### *Standard of Review*

A summary judgment motion is not a substitute for trial. Rather it is used to dispose of cases when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. The standard for appellate review of a trial court's grant of summary judgment is whether the trial judge was legally correct in his or her rulings. In granting a motion for summary judgment, the trial judge may not resolve factual disputes, but instead is limited to ruling on matters of law. . . . If any inferences

---

5. Amoco's breach of contract claim concerned monies owed it at the time Akparewa's franchise was terminated. We note that Akparewa has not argued that the trial court erred in granting summary judgment to Amoco on its breach of contract claim, only that the trial court erred in granting summary judgment against him. Thus, it appears that Akparewa concedes that he owes Amoco $8,006.09, the amount awarded by the jury.

may be drawn from the well-plead facts, the trial court must construe those inferences in the light most favorable to the non-moving party. The existence of a dispute as to some non-material fact will not defeat an otherwise properly supported motion for summary judgment, but if there is evidence upon which the jury could reasonably find for the non-moving party or material facts in dispute, the grant of summary judgment is improper.

*Okwa v. Harper,* 360 Md. 161, 178, 757 A.2d 118 (2000) (citations omitted).

### The Gasohol and Gasoline Products Marketing Act

In the early 1970s, gasoline shortages were occurring and oil companies were moving from "crude oil production, transportation, refining, and wholesale marketing" of oil into marketing their own products at retail. Comment, *Gasoline Marketing Practices and "Meeting Competition" Under the Robinson–Patman Act: Maryland's Response to Direct Retail Marketing by Oil Companies,* 37 Md. L.Rev. 323 (1977). In 1973, the General Assembly passed The Gasohol and Gasoline Products Marketing Act ("PMA"), Md.Code (1975, 1990 Repl.Vol., 1999 Supp.), § 11–301 *et seq.* of the Commercial Law Article, because of its concerns "about the distribution and sale through marketing arrangements of petroleum products in" Maryland. *Becker v. Crown Central Petroleum Corp.,* 26 Md.App. 596, 598, 340 A.2d 324 (1975). *See also* Ellen R. Jordan, *Unconscionability at the Gas Station,* 62 Minn. L.Rev. 813 (1978). "The 1973 law addressed what the General Assembly evidently saw as an imbalance of economic power between the oil companies and their dealers that it believed was detrimental to the State and in need of redress." *Comptroller of the Treasury v. Crown Cent. Petroleum Corp.,* 52 Md.App. 581, 583, 451 A.2d 347 (1982).

The General Assembly found "that since the distribution and sale through marketing arrangements of petroleum products in the State vitally affect the economy of the State, and its public interest, welfare, and transportation, it is necessary to define the relationships and responsibilities of the parties to

certain agreements pertaining to these marketing arrangements." PMA § 11–302. The PMA, in overview, defines certain terms, § 11–301; requires distributors to give certain specific information to its dealers, § 11–303; sets out provisions to which marketing agreements are subject, § 11–304; specifies defenses to the termination or cancellation of a marketing agreement, § 11–305; requires that written notice of the intent to terminate or cancel the agreement be given, § 11–306; and designates remedies for a violation of the agreement, § 11–307. Neither party disputes the applicability of the PMA to the instant case.

### *I. Section 11–303(1) & (2) of the PMA*

█ The first provision of the PMA implicated in this case pertains to disclosure:

Before any marketing agreement is concluded, a distributor shall disclose fully to a prospective dealer the following information:

(1) Any gallonage history of the location under negotiation for the shorter of:

(i) The three-year period immediately past; or

(ii) The entire period during which the location has been supplied by the distributor;

(2) The name, last known address, and reason for the termination of the marketing agreement of each person who was a dealer at the location during:

(i) The five-year period immediately past; or

(ii) The entire period during which the location has been supplied by the distributor;

(3) Any commitment for the sale, demolition, or other disposition of the location;

(4) Any training program and any specific goods and services which the distributor will provide for and to the dealer;

(5) Any obligation which will be required of the dealer;

(6) Any restriction on the sale, transfer, and termination of the agreement; and

(7) The total amount of any cash deposit required, any amount of interest to be paid on the deposit, and the conditions for the return of the deposit.

PMA § 11–303. The purpose behind the required disclosure was to enable prospective dealers "to make an intelligent and considered decision on whether to enter into an agreement." *Becker*, 26 Md.App. at 599, 340 A.2d 324.

■ It is undisputed that Amoco failed to provide all of the required information under § 11–303(1) and (2). In particular, Amoco provided the gallonage history for two rather than three years prior to the contract. Furthermore, Amoco failed to provide Akparewa with information about Owen Ray, the franchisee prior to Farhat. Akparewa argues that Amoco's failure to comply with the disclosure requirements of the PMA results in *per se* liability because the legislation creates an irrebuttable presumption of reliance. Akparewa contends that the operative "material fact" in this case is Amoco's failure to disclose the prior franchisee and the required gallonage history of Park Circle Amoco. Because Amoco conceded that it failed to provide some of the required information, there was no dispute of material fact and summary judgment should have been granted for Akparewa.

Amoco argues that the PMA raises, at most, a rebuttable presumption of reliance and that, in any event, Akparewa must prove that he was actually damaged by the insufficient disclosure before Amoco is subject to liability. Amoco argues that, because Akparewa did not rely upon Amoco's disclosures, he could not have been damaged by any failure to disclose. In Amoco's view, the operative "material fact" is Akparewa's reliance, if any, on Amoco's disclosures of failure to disclose.

At this point, we find it useful to review the rules of statutory interpretation:

The object of statutory construction is to effectuate, after discerning, the real intention of the Legislature. The search for legislative intent begins, and ordinarily ends, with the words of the statute under review. Where, giving the words of the statute their ordinary and common meaning,

the statute is clear and unambiguous, it usually is unnecessary to go further. We may, however, confirm the meaning reached by reference to the words of the statute by considering the purpose, goal or context of the statute. This means that we are required to interpret the statute as a whole, and, if appropriate, in the context of the entire statutory scheme of which it is a part. Moreover, no word in the statute or no portion of the statutory scheme should be read "so as to render the other, or any portion of it, meaningless, surplusage, superfluous or nugatory."

*Prince George's County v. Vieira,* 340 Md. 651, 658, 667 A.2d 898 (1995) (citations omitted).

█ PMA § 11–303 sets out the information that must be disclosed to a prospective dealer. Because the information required to be disclosed is specific and well-delineated, we believe that the General Assembly deemed the information to be material information that a reasonable potential franchisee would wish to know prior to entering into a contract. *Becker,* 26 Md.App. at 599, 340 A.2d 324. There is no express language in this provision, however, that creates a presumption, either of reliance or of liability, arising out of a failure to comply with the disclosure provision.

A search of the legislative history of the PMA revealed no information from which we might infer that the General Assembly intended a failure to disclose would give rise to *per se* liability. Moreover, the "remedies" provision of the PMA states: "Any person who violates any provision of this subtitle is liable for damages caused by the violation and is subject to the other legal or equitable remedies available to the party injured by the violation." PMA § 11–307. This provision provides liability only for damages caused by the violation.

█ Although case law on this issue is scarce, prior interpretations of this provision have found that it "enabled a prospective dealer to make an intelligent and considered decision on whether to enter into an agreement." *Becker,* 26 Md.App. at 599, 340 A.2d 324. Because one of the purposes behind this legislation was to help the potential franchisee,

who is in a weaker position compared to the powerful oil company-franchisor, we conclude that the General Assembly intended that a prospective dealer have the benefit of this important information "before entering into marketing agreements," *Crown Central,* 52 Md.App. at 583, 451 A.2d 347, and created a presumption of reliance by the prospective dealer on the information to be provided. This presumption may be rebutted, however, if it can be shown that the buyer did not rely upon the inadequate or inaccurate disclosure and, consequently, was caused no damages by the violation.

Akparewa argues that, if Amoco had provided him with the required disclosure, he would have reneged on the contract with Farhat. As Akparewa acknowledges, this would have resulted in a monetary loss, but he contends that the loss would not have been as great as it was. Akparewa has stated affirmatively that he relied on the disclosure and that his reliance caused him damages. The burden then shifts to Amoco to show that he did not rely on its disclosure and was therefore not damaged. *Helman v. Kim,* 130 Md.App. 181, 187–88, 745 A.2d 451 (2000); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Whether Akparewa relied on Amoco's information in completing the purchase of Farhat's interest in the Park Circle Amoco is an inquiry of material fact. We believe that there was a dispute as to such reliance.

The circuit court made the following finding: "It's clear that Mr. Akparewa said that he wasn't relying upon historical information in order to make a decision. So, to me[,] proximate cause can't be there." Although the circuit court correctly noted that the law requires reliance resulting in damages, Akparewa's reliance on Amoco's inadequate disclosure is not clear. Akparewa has stated unequivocally that he relied on Amoco's disclosures. For example, in his first Affidavit, dated November 30, 1999, Akparewa stated:

Amoco did not disclose to me the three year gallonage history at the subject station, nor did Amoco disclose to me any information about the previous dealers at the station. I learned this information after Amoco terminated my fran-

chise. Had I known this information before I signed the marketing agreement with Amoco, I would not have pursued my purchase of the business.

In his second Affidavit, dated December 23, 1999, Akparewa stated:

On or about February 25, 1997, Amoco provided me with a package of information that included written disclosures about the subject station, a business plan, and dealer application. I relied upon Amoco's disclosures in preparing my business plan for the station.

\* \* \*

Had I known at the time [of concluding the deal] that Amoco would later force me to do business with a convenience store supplier of its choosing, I would not have pursued my purchase of the business.

The trial court appears to have noted Akparewa's statements that he relied on Amoco's disclosure but then made its own credibility determination in coming to the conclusion that Akparewa did not, in fact, rely on the disclosure.

"The summary judgment process is not properly an opportunity for the trial court to give credence to certain facts and refuse to credit others. *See Pittman v. Atlantic Realty Co.,* 359 Md. 513, 537, 754 A.2d 1030, 1042–43 (2000) (citations omitted)(the trial judge is not permitted to weigh evidence in deciding a motion for summary judgment); *Sheets v. Brethren Mut. Ins. Co.,* 342 Md. [634, ]638, 679 A.2d [540,] 542 [1996] ('[i]n granting a motion for summary judgment, the trial court does not resolve factual disputes, but instead is limited to ruling as a matter of law'); *Dobbins v. Washington Suburban Sanitary Comm'n,* 338 Md. 341, 345, 658 A.2d 675, 677 (1995) ('the trial court does not determine facts, but instead rules on the motion [for summary judgment] as a matter of law')."

*Okwa,* 360 Md. at 182, 757 A.2d 118.[6] The issue of reliance in this case ultimately comes down to an issue of credibility, and

---

6. The circuit court did not have the benefit of the *Okwa* and *Pittman* decisions at the time it decided the summary judgment motions.

a trier of fact must determine whether Akparewa relied on his own research, as Amoco contends, rather than the past history of the gas station as disclosed by Amoco, as Akparewa contends. Because resolution of this disputed material fact is necessary, summary judgment is not appropriate.

To be sure, the record in this case shows increasingly detailed allegations of reliance on Amoco's disclosures as the case progressed and the parties became more involved in arguing and defending the respective summary judgment motions. A trier of fact might conclude after weighing the evidence and making a credibility assessment that Akparewa relied solely on his own business judgment and not on Amoco's deficient disclosure, but that cannot be decided by summary judgment.

## II. Section 11–303(5) of the PMA

■ Appellant next argues that Amoco violated § 11–303(5) of the PMA, which states that the distributor must disclose "[a]ny obligation which will be required of the dealer." Appellant argues that Amoco advised "that it would not 'exercise any control over the general business operations of the dealer' " but subsequently "under threat of lease termination, required appellants to do business with Miller and Hartman." There is a dispute of fact as to whether Amoco, through its representative Stephen Brown, required Akparewa to do business with Miller & Hartman or whether it was a suggestion.[7]

---

7. This claim appears to us, as it did to the circuit court, to be more appropriate as a breach of contract claim. In fact, at the summary judgment hearing, there was some discussion about whether this was properly a breach of contract claim and the propriety of allowing Akparewa to file a third amended complaint. The circuit court indicated that it felt it was getting too close to trial to allow further amendment of the complaint. Akparewa was clearly determined to proceed on the claim under his theory that Amoco failed to disclose a material fact, i.e., that Amoco could require him to do business with a particular vendor:

The reason, of course, that we framed the complaint as we did is that we were relying upon the disclosures that were made by Amoco, the, the disclosure documents and focused on the Maryland act. The fact

Although this factual dispute alone would normally preclude entry of summary judgment, if Akparewa did not rely on Amoco's statement, there would be no damages. Again, Akparewa argues in his brief that, if Amoco had complied with the PMA in all respects, he would not have closed the deal with Farhat:

> Here, Mr. Akparewa testified that he would not have purchased the business had he known the facts that were not disclosed, or if he had known the truth about the Miller and Hartman issue. In addition, however, it is clear that the false representations by Amoco that it would not "exercise any control over the general business operations of the dealer" and that Mr. Akparewa would not have to do business with anyone other than Amoco—misrepresentations that induced appellants to settle on the business and become the franchisee—ultimately led to the downfall of the business when the falsity was revealed and Amoco forced the change to Miller and Hartman. That forced change created appellants' NSF problems, which ultimately resulted in the termination of the franchise and the loss of appellants' investment.
>
> *    *    *
>
> Mr. Akparewa would not have purchased the business had he known that Amoco would force him to deal with a convenience store supplier of Amoco's choosing, particularly where the convenience store supplier, and not Mr. Akparewa, would dictate the operation of the convenience store.

Akparewa was required to generate a factual dispute concerning his reliance on Amoco's representations that it would not exert any control over his business operations in completing the purchase of Farhat's interest in the Park Circle Amoco. As indicated above, Akparewa's affidavit of December 23, 1999, stated that he relied on Amoco's disclosure that he would not be required to do business with a particular vendor and

---

they did not make the disclosures is the basis for liability under this complaint and the negligent misrepresentation claim, Your Honor. In light of the foregoing, we confine our discussion to the PMA.

that he would not have purchased the business had it been disclosed that he would be required to do so. Summary judgment was inappropriate.

### III. Negligent Misrepresentation

■ Appellant next argues that Amoco negligently represented that it would not require Akparewa "to do business with anyone other than Amoco." The Court of Appeals has described the tort of negligent misrepresentation as follows:

[I]n its most general sense, negligent misrepresentation arises when the defendant owes a duty of care in communicating information to the plaintiff and that duty is breached, causing pecuniary or personal injury to the plaintiff. It has been said that "the most common example of the duty to speak with reasonable care is based on a business or professional relationship, or one in which there is a pecuniary interest." In *Weisman* [*v. Connors,* 312 Md. 428, 540 A.2d 783 (1988) ], we reaffirmed the five elements of negligent misrepresentation as:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

312 Md. at 444, 540 A.2d at 791 (citing *Martens Chevrolet, Inc.,* 292 Md. at 337, 439 A.2d at 537). See also *Village of Cross Keys, Inc.,* 315 Md. at 755–56, 556 A.2d at 1133.

*Griesi v. Atlantic General Hosp. Corp.,* 360 Md. 1, 11, 756 A.2d 548 (2000) (citations omitted).

■ In order to determine whether a duty of care existed, Akparewa must prove that Amoco owed him "a duty of care

by demonstrating an intimate nexus between them." *Griesi,* 360 Md. at 12, 756 A.2d 548. "The intimate nexus may be demonstrated by showing contractual privity or its equivalent." *Id.* (citing *Jacques v. First Nat. Bank of Maryland,* 307 Md. 527, 534–35, 515 A.2d 756 (1986)). Akparewa and Amoco are in contractual privity in this case.

With respect to the second element of negligent representation, Amoco doubtless intended Akparewa to rely on the assertions contained in the Agreement. This is particularly true in light of the PMA, which mandates the disclosure of required vendor relationships. The PMA also suggests that Amoco knew that Akparewa would probably rely on the disclosures it made, at least with respect to the Amoco/Akparewa contract.

With respect to the issue of reliance, there was a dispute of material fact and summary judgment was inappropriate.

### IV. Standing of Vaga, Inc.

■ Appellant's final argument is that the circuit court erred in ruling that Vaga had no standing to sue in this case. Appellant argues that Vaga is a "real party in interest" to the case, because Amoco was paid out of an account owned by Vaga. The circuit court disagreed, stating:

> Let me back up and I say [sic] I guess as to Vaga, the motion is granted as to all counts because Vaga was not a party to this contract. In fact, the contract specifically provided that Amoco is not going to contract with the corporation but only with an individual and the third-party beneficiary argument this Court rejects. The contract was between these two parties.

■ Rule 2–201 states: "Every action shall be prosecuted in the name of the real party in interest, except that ... [a] person with whom or in whose name a contract has been made for the benefit of another, ... may bring an action without joining the persons for whom the action is brought." A "real party in interest" must have "an actual, real and justiciable interest susceptible of protection through litigation." *Boyd v.*

*Hickman,* 114 Md.App. 108, 129, 689 A.2d 106 (1997). The interest in this case arises from the contract as well as from the statute.

In its initial disclosure dated February 25, 1997, Amoco made the following disclosure:

Although, with the exception noted above [with respect to stations run by publicly held corporations], **Amoco does not ordinarily deal with corporate or partnership Dealers. An individual Dealer may, on occasion, with Amoco's consent, lease or sublease the premises, or assign his Dealer Agreement, to a corporation or partnership. In such instances, the individual Dealer must guarantee the debts** of the corporation or partnership arising out of the transfer, and either the individual Dealer or another designated individual person must personally manage the Dealer activities on the premises. No change of ownership in the corporation or partnership may occur while the lease, sublease, or assignment remains in effect. [Emphasis supplied.]

Additionally, the Agreement dated July 2, 1997, was specifically concluded between Amoco and "Gabriel Akparewa 'Lessee.' " The Agreement also contained the following language:

Lessee shall not voluntarily or involuntarily assign, encumber, mortgage or otherwise transfer this Lease or sublet the Premises or any part thereof, or suffer or permit the Premises or any part thereof to be used or occupied by others, by operation of law or otherwise, without the prior written consent of Lessor [Amoco] in each instance which may be granted or withheld in Lessor's sole discretion. Absent such consent, any act or instrument purporting to do any of the foregoing shall be null and void.

As Akparewa indicated throughout his deposition, he understood that Amoco was unwilling to deal with a corporation and that he was ultimately personally responsible for the rights and responsibilities under the agreement with Amoco:

Q [by Amoco's attorney]: How come Mr. Korie and Vaga didn't sign these documents [relating to the franchise]?

A [by Akparewa]: Because as Steven [Brown] explain[ed] it that whatever corporation you want to operate this business under or partnership will not—you know, will be on the side but only one person will have to be up front.

Akparewa stated that he never assigned the franchise to Vaga, and that he understood he had entered both the Farhat and Amoco contracts as an individual was individually responsible to Amoco.[8] Akparewa believed that he had transferred the following to Vaga: "[t]he management of the station, the hiring of the employees. I mean, the day-to-day operation of the business." Akparewa indicated that there was a writing between his partner in Vaga and himself purporting to transfer some interest in the franchise to the corporation. This writing, however, was rendered "null and void" by appellant's agreement with Amoco.

In addition to the foregoing, Vaga is not a "dealer" under the PMA, at least in the context of the Agreement. " 'Dealer' means a person [9] engaged in the retail sale of gasohol or gasoline products under a marketing agreement,[10] at least 30

---

8. Q [by Amoco's counsel]: But you were responsible individually to Amoco? Is that how you understood it?

A [by Akparewa]: That's how I understood it, but I mean, it's a giant corporation, and they make you to do anything they want you to do [sic].

9. " 'Person' includes an individual, corporation, business trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity." PMA § 11–301(j).

10. "Marketing agreement" means an oral or written agreement between a distributor and a dealer under which the dealer is granted the right, for the purpose of engaging in the retail sale of gasohol or gasoline products supplied by the distributor, to:

(1) use a trademark, trade name, service mark, or other identifying symbol or name owned by the distributor; or

(2) Occupy premises owned, leased, or controlled by the distributor. PMA § 11–301(i).

percent of whose gross revenue is derived from the retail sale of gasoline products." PMA § 11–301(c)(1). Under this particular marketing agreement, the "person" was Akparewa individually. Vaga has no standing to sue for alleged violations of the PMA, as it is not the dealer under its provisions. With respect to the negligent misrepresentation claim, it has no standing to sue, because the duty flowed from Amoco to Akparewa, and not to Vaga.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

COSTS TO BE PAID ¾ BY APPELLEE AND ¼ BY APPELLANTS.